Rachael L. Smiley (State Bar. No. 24066158)
Alex Campbell (State Bar No. 24095536)
**FERGUSON BRASWELL FRASER KUBASTA PC**
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Phone: 972-378-9111
Fax:    972-378-9115
rsmiley@fbfk.law
acampbell@fbfk.law

**PROPOSED COUNSEL FOR DEBTOR IN POSSESSION**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **POGO ENERGY, LLC,** | § | **Case No. 21-31224-MVL** |
| | § | |
| | § | |
| **Debtor.** | § | |
| | § | |

### DECLARATION OF PHILLIP TERRY IN SUPPORT OF
### FIRST DAY MOTIONS AND APPLICATIONS

I, Phillip Terry, declare as follows under the penalty of perjury:

1.      I am CEO and Managing Member of the Board of Pogo Energy, LLC, a Texas limited liability company (the "**Debtor**" or "**Pogo**"), the debtor in the above-captioned chapter 11 case.  I have served in these capacities since the formation of the Debtor in 2017.  I am familiar with and directly manage many aspects of the Debtors' day-to-day operations, businesses, and financial affairs.

2.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this case and in support of the Debtor's petition for relief under chapter 11 of the Bankruptcy Code and the pleadings filed by

the Debtor on or around the petition date. I have reviewed the factual support set forth in each of the first day pleadings and attest to the accuracy thereof. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with the Debtor's professionals, my review of relevant documents, or my opinion based on upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

3.     This Declaration has two parts. Part One of this Declaration provides an overview of the Debtor's business, capital structure, and events giving rise to this chapter 11 case and information regarding the Debtor's bankruptcy objectives. Part Two summarizes the relief requested with respect to, and the support for, the Debtor's various first day motions and requests for related interim and final orders.

## PART ONE: OVERVIEW

### I.     The Debtor, its Business, and Events Leading to Bankruptcy

4.     Pogo Energy was founded in 2017 as a retail energy provider (REP) based on a pay-as-you-go business model (a.k.a. prepaid) for providing electricity services in Texas to consumers. The pay-as-you-go model was a good match for the Texas electricity market: and the market for a prepaid product in Texas was well-defined but poorly executed by current competitors. Pogo identified an opening for a new way to provide a competitive, prepaid service in Texas electricity. Pogo delivers a competitive product with exceptional service without a contract commitment, credit check, deposit, or hidden fees.

5.     In order to provide electricity services to its customers on a pay-as-you-go model, Pogo makes purchases of energy, generally in advance based on weather projections, and other

conditions affecting the energy market, from Luminant Energy Company, LLC ("**Luminant**"), and then provides the energy it has purchased to its customers. Pogo also accesses the spot market through Luminant to the extent it needs to purchase energy instantaneously to meet customer needs. Pogo's advance energy purchases are hedges – like other REPs, Pogo attempts to estimate its needs as accurately as possible so that it can avoid purchasing on the spot market, which is far more expensive.

6. When customers sign up for Pogo's prepaid electricity services, they are required to start an account with a minimum $20.00 balance , which is then decremented as they consume energy. Customers pay a fixed amount (approximately 7.1 cents per kilowatt hour). When the account balance reaches $0.00, service is terminated until the customer refills the account.[1]

7. The core values of Pogo centered upon a passion for doing right by our customers and challenging the status quo through continuous process improvement. These values drive the mission and purpose for our product offering, customer care objectives, and energy hedging strategy. The vision from our core values results in a best-in-class in pay-as-you-go electricity service for Texas.

8. The success of Pogo's operation is built on an intuitive, self-enrollment portal, simple and easy to understand pricing, with customer care options for reaching and serving the customer when and where they prefer to be served. Pogo also offers a number of flexible payment options for customers, including brick and mortar payment locations for customers that pay in cash. Pogo measures progress daily, weekly, and monthly with thousands of customer data touch points to ensure a happy, long-lasting customer experience.

---

[1] Customers may, under certain circumstances, have a negative balance, e.g. when disconnections are not allowed by the PUCT, like on weekends, holidays, or an emergency order or weather moratorium.

9.     Pogo found success soon after its founding.  In Pogo's second full year of operation, it was recognized as one of six retailers earning a 5-Star rating for customer service from the Public Utility Commission of Texas (PUCT).  In 2020, it became cash flow positive just 36 months after launch and with less than 15,000 customers.  This was in spite of the ongoing COVID-19 pandemic that was affecting the ability of businesses in almost every industry from operating profitably.

10.     Unfortunately, Pogo's success was abruptly curtailed by the winter storm that crippled much of Texas in February, 2021 ("Storm Uri") and the related power crisis and subsequent override of regulations and market pricing, all of which had uniquely painful ramifications for Pogo's business model.

11.     Pogo has a risk management energy hedging approach that is both long-term and risk averse.   Pogo continually hedges, 24 hours a day, 7 days a week, using various products available to retailers in the ERCOT[2] deregulated market.   The impact of Storm Uri was unprecedented as evident by the damage sustained to the electricity grid, the supply chain to the grid, and human toll.  However, the real damage for Pogo came from the PUCT interference with market pricing during the storm. Specifically, The PUCT stepped in and forced pricing to the maximum of $9,000 per megawatt-hour for several days in an otherwise completive, free market (translated, Pogo's customers pay a retail price is 7.1 cents per kilowatt hour; while energy cost during the Storm Uri event was $90 per kilowatt hour to Pogo).

12.     This price manipulation caused the invoice for Pogo to exceed its normal February amount by more than 30 times, a cost greater than $26 million.  For context, a study[3] conducted

---

[2] Electricity Reliability Council of Texas (ERCOT).

[3] https://www.spglobal.com/platts/en/market-insights/latest-news/electric-power/060221-ercot-power-prices-could-have-been-73-lower-during-winter-storm-study

by Vistra Energy underscored that the costs during the storm should have been approximately 73% less without the price manipulation effected by the PUCT. Further damage was done when, subsequent to its actions to manipulate the free market during the storm, the PUCT was reluctant to reprice after the storm, including the chairman of the PUCT outright pledging to Wall Street that he would protect the industry's windfall profits.[4]

13.     During and after the storm, the Governor of Texas issued a disaster declaration and suspended all consumer disconnects on any past due electricity accounts (known as DNPs, or disconnects for non-pay).  The DNP suspension continued for over 135 days, finally ending on June 14, 2021.  During this period of time nearly half of Pogo customers' accounts were negative – meaning that the customers were using energy that Pogo had purchased, but that the customers had not prepaid for. Furthermore, because Pogo operates on a pay-as-you-go model, and does not have contracts with its customers, it generally lacks recourse with respect to collecting from its customers for the unpaid services it has provided to them.  The DNP suspension ultimately produced over $1.4 million in potential bad debt, and took an enormous toll on the cash available to run the business.  When added to the unprecedented February invoice, Pogo's financial situation increasingly became untenable.

## II.   Debtors' Capital Structure and Relationship with Luminant

14.     Luminant Energy Company, LLC ("**Luminant**") is the generation arm of Vistra Energy LLC ("**Vistra**").  Luminant is considered Pogo Energy's credit facility to the ERCOT market for all energy purchase transactions.  Luminant is also our designated Qualified Serving Entity ("**QSE**") settling all transactions with the market for Pogo; Pogo remits subsequent payment to Luminant.  All Pogo market transactions are executed through Luminant whether the energy

---

[4] https://www.texasmonthly.com/news-politics/wall-street-profited-off-texas-blackouts/

comes directly from Luminant or from a Luminant competitor. Luminant does not provide risk management guidance, but does require a risk management policy and practice.

15. In consideration for the QSE services provided by Luminant, the Debtor and Luminant are parties to the following agreements (together, the "**Agreements**"):

- Master Power Purchase and Sale Agreement dated September 25, 2017;
- Energy Marketing Support Agreement dated September 25, 2017; and
- Deposit Account Control Agreement, dated October 26, 2017.

16. Pogo has developed a good working rapport with Luminant over the first three and a half years of its operation. Luminant has been a critical partner for Pogo Energy and its success during this time. However, once the damage from the Storm Uri impacted Pogo's performance, the relationship became strained, and devolved into an impasse regarding the best approach to resolve the outstanding amount due to Luminant, which is in excess of $26 million. Because Vistra does not offer a prepaid product from its retail brands (and thus does not compete for, or have a need for, Pogo's customers), Pogo believed that the best solution for both parties was through a workout or payment plan to allow Pogo to continue in business while paying off debt it could afford or manage. Luminant, for its part, has expressed only middling interest in working with Pogo on a payment plan or workout strategy, and hopes for reaching an agreement with Luminant have faded as Pogo's limited resources have become increasingly stretched.

17. The primary risk to Pogo and to its customer of not being able to reach an agreement with Luminant is that the customers would drop from Pogo's service to that of a provider of last resort ("**POLR**"). If a default is declared by a TDU (Transmission and Delivery Utility, such as Encor or Centerpoint), then pursuit to PUC Substantive Rule 25.43, the defaulting REP's customers are subject to a customer mass transition from the defaulting REP to a new designated

POLR REP. Such a POLR event causes immediate asset depreciation and customer-payment revenue arrest, and is generally an undesirable situation for customers. Pogo customers would consequently encounter a sudden event of transition with new REP requirements that would include, in most cases, new or additional deposits, higher energy rates, and along with this, customer uncertainty and dissatisfaction.

## PART TWO: TESTIMONY IN SUPPORT OF FIRST DAY RELIEF

### I. Cash Management Motion

18. Pursuant to *Debtor's Emergency Motion for an Interim and Final Order Authorizing Continued Use of Existing (a) Cash Management System, (b) Accounts and Business Forms, and (c) Related Practices* ("**Cash Management Motion**"), the Debtor seeks an order authorizing it to (i) to maintain its existing bank accounts, and (ii) to continue to operate its Cash Management System[5] and related processes, ordinary course payments and receipts, and payment of any bank fees, in the ordinary course of business consistent with their pre-petition practices.

19. In the ordinary course of business, the Debtor manages the financial aspects of its businesses through, as each is defined below, a Cash Management System, Bank Accounts, the use of Business Forms, and related processes, including Ordinary Course Payments and Receipts (collectively, the "**Account Systems and Practices**").

20. In its day-to-day operations, the Debtor manages its cash, receivables, and payables (including payroll and tax obligations) through a cash management system through which it collects, transfers, and disburses funds generated from accounts receivable (the "**Cash Management System**"). The Cash Management System is tailored to meet the Debtor's current

---

[5] All capitalized terms not otherwise defined in this Declaration shall have the meanings assigned to them in their respective Motions.

operating needs and enables the Debtor to control and monitor funds and available cash, as well as keep current and accurate accounting records of all daily cash transactions.

21.     The Debtor outsources the daily operation of its administrative, bookkeeping, and controller services through a third-party vendor, Supporting Strategies.[6]  The Supporting Strategies professionals who are assigned to the Debtor's account are well-acquainted with the cash needs and financial obligations of the Debtor's business. Supporting Strategies sets up the Debtor's external vendors on Bill.com.  Invoices are then forwarded to an accounts payable email address that is received by Supporting Strategies.[7]  The Debtor's fractional CFO, Wayne Scott, then approves the release of funds to pay invoices.

22.     As part of their Cash Management System, the Debtor maintains bank accounts with Prosperity Bank ("**Prosperity**"):

- **Pogo Main Operating Account**: This is the operating account from which payables are disbursed (including ACH, bill.com electronic payments, wires, paper checks).

- **DACA Account**: This account is subject to a Deposit Account Control Agreement ("DACA") with Luminant[8]  and is the collection account for all customer payments (cash, credit/debit cards).

- **Pogo $50 Escrow Account**: This account is used to comply with the Public Utility Commission regulation that requires the Debtor to hold any customer account balances over $50 in an escrow account separate from its main operating account.

---

[6] The continued retention of these third-party accounting professionals, including Supporting Strategies, its payroll processor, TriNet, and the Debtor's fractional CFO, Wayne Scott, will be addressed in a separate motion to this Court, requesting that the Debtors be authorized to retain certain professionals in the ordinary course of business.

[7] Supporting Strategies also plays a role in processing customer refunds, a process that is explained in more detail in the Debtor's *Emergency Motion for an Interim and Final Order Authorizing the Debtor to (I) Honor Customer Prepayments and Refunds of Electricity Services, (II) Receive, Process, and Honor E-Commerce Transactions, and (III) Pay Certain Fees Associated with E-Commerce Transactions* ("**E-Commerce Payments Motion**"), filed contemporaneously herewith.

[8] See *Debtor's Emergency Motion for Interim and Final Order Authorizing Use of Cash Collateral*, filed contemporaneously herewith.

- **Pogo Savings Account**: This account is used for taxes and other infrequently-due payables

23. I understand that Prosperity is a bank listed as an "authorized depository" by the Office of the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**").

24. In contemplation of the commencement of the chapter 11 case, I have caused the Debtor to direct Supporting Strategies to, as of the Petition Date, refrain from making any payments on account of any prepetition obligations owed by the Debtor without the prior approval of the Debtor, which approval will only be granted with respect to payments authorized by an order of this Court. Similarly, the Debtor has caused all automatic payments from the Bank Accounts have to be cancelled to avoid payment of prepetition obligations, and the Debtor has instructed Prosperity to not honor any prepetition checks that had not cleared as of the Petition Date.

25. In the ordinary course of business, the Debtor makes payments and collects receipts for payment for services provided to their customers via check, cash, wire transfer, automatic clearing house payments (ACH), and credit card charges and receipts[9] (including the payments described in this subsection, the "**Ordinary Course Payments and Receipts**").

26. Historically, the Debtor has not maintained a credit card; however, certain of its Ordinary Course Payments are made to vendors (including Twilio, Azure Microsoft (cloud services) and WeWork) who require that payments for certain business expenses be made by credit card. Likewise, certain *de minimus* business expenses of the Debtor have also been made via credit card (collectively, the "**Credit Card Expenses**"). The Debtor's Credit Card Expenses have historically been made using my personal credit card. I routinely submit such Credit Card Expenses via an expense report to Supporting Strategies after being approved by Mr. Wayne Scott,

---

[9] By separate motion, the Debtors are seeking certain relief regarding the continued acceptance of credit card transaction payments from Debtor's customers and the use and payment of third-party credit card processors.

the Debtor's CFO. I understand the Debtor seeks approval to pay for the Credit Card Expenses through my credit card, subject to its currently-existing procedures for the approval and reimbursement of such expenses. As part of its entrance to the bankruptcy process, the Debtor has stopped use of my credit card pending order of this Court. As of the Petition Date, there are no outstanding prepetition amounts owed to me on my personal credit card.

27.     I understand that one of the U.S. Trustee Guidelines in this jurisdiction requires a chapter 11 debtor-in-possession to open new bank accounts and close all existing accounts. The Debtor currently seeks a waiver of, among other things, the U.S. Trustee's requirement that the Bank Accounts be closed and new post-petition accounts be opened. Particularly at this point in these chapter 11 cases, this requirement would cause significant disruption in the Debtors' business and would impair their efforts to reorganize. Similarly, the requirement to immediately alter its business forms and checks to comply with the U.S. Trustee obligations would require the Debtors to expend significant time and resources.

28.     In sum, I submit that requiring the Debtor to adopt new cash management systems, open new bank accounts, and develop new practices with regard to account management, use of business forms, and its ordinary course payments and receipts, all as more fully described in the Case Management Motion, at this early and critical stage of this chapter 11 case would impose a significant administrative burden and cause needless disruption. As a result, the Debtor requests authority to continue the use of the existing Bank Accounts and Cash Management System.

29.     I understand that prior to filing this case, the Debtor's counsel has contacted the U.S. Trustee to discuss the possibility of continuing the current accounts and systems in place on an agreed basis while allowing the Debtor and the U.S. Trustee to further discuss the Debtors' going-forward approach to their current cash management-related systems and practices. I

understand that U.S. Trustee has agreed to allow the Debtor to continue to use its existing Bank Accounts and systems, subject to Prosperity converting such account to debtor in possession (DIP) accounts.

## II.    Utilities Motion

30.    Pursuant to the *Debtor's Emergency Motion for an Interim and Final Order (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; and (ii) Determining Adequate Assurance of Payment for Future Services* ("**Utilities Motion**")The Debtor seeks entry of an  order (i) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (ii) determining that the Utility Companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (iii) approving the Debtor's proposed offer of adequate assurance; and (iv) determining that the Debtor is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

31.    In connection with the operation of its business, the Debtor obtains telephone, facsimile and related services (the "**Utility Services**") from a number of utility companies or their brokers (the "**Utility Companies**").  Attached to Utilities Motion is a list of the Utility Companies that provide Utility Services to the Debtor as of the Petition Date

32.    The Debtor intends to timely pay all post-petition obligations owed to the Utility Companies and expects that available funds will be more than sufficient to pay all such obligations. Based on the availability of funds to timely honor all post-petition obligations to the Utilities, it is my belief that the Utilities have adequate assurance of its future performance of the Debtor's obligations to the Utility Companies.  Furthermore, I believe that the Utility Companies have

adequate notice and the ability to object to the proposed adequate assurance under the Utilities Motion.

33.     I believe the proposed adequate assurance of the Debtor's payment obligations to the Utilities is reasonable under the circumstances.  In addition, I submit that uninterrupted utility service is essential to the Debtor's ability to maintain its operations and provide services to its customers, and therefore the emergency relief requested in the motion is necessary to prevent irreparable harm to the Debtor's business and its efforts to reorganize.  Therefore, such relief is in the best interest of the Debtor's estate, its creditors, and other parties in interest.

**III.     Insurance Motion**

34.     Pursuant to the *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Pre-Petition Insurance Program; and (II) Pay Any Pre-Petition Premiums and Related Obligations* ("**Insurance Motion**") the Debtor seeks an order: (i) authorizing the Debtor to (a) maintain its existing Insurance Program and pay all obligations arising thereunder, including any Premium Payments, (b) pay any and all obligations in connection with the Insurance Program, including any additional fees or expenses that may arise, and (c) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in Debtor's business judgment; as well as (ii) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing.

35.     I have been advised by counsel that any payments made to maintain the Insurance Program likely fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code; however, the Debtor seeks permission to make such payments out of an abundance of caution.

36.     It is my understanding that continuation of the Insurance Program is essential to the preservation of the value of the Debtor's business, property, and assets.  I further understand that United State Trustee Guidelines require chapter 11 debtors maintain adequate insurance coverage.

37.     Although Debtor is current on all Premiums, there is a possibility a need will arise to add additional Policies to the Insurance Program, or that unforeseen expenses may arise in order to maintain the current Policies held under the Insurance Program. Furthermore, it will be necessary for Debtor to renew these Policies upon their expiration, and make another lump sum payment when renewing.

38.     Given the Debtor's need to maintain insurance to operate its business and prudently manage and preserve cash flow, authorizing the Debtor to maintain the Insurance Program, including making the payments required by the Policies is in the best interests of all parties in interest in these cases.  If the Debtor does not obtain the relief requested in the Insurance Motion, it may suffer immediate and irreparable harm because (a) the Debtors would be at risk of jeopardizing its assets if a Carrier terminated coverage due to nonpayment of Premiums; (b) the Debtor would risk consequences in this chapter 11 case under the Bankruptcy Code and U.S. Trustee Guidelines if it fails to maintain adequate coverage; (c) the Debtor's assets would be harmed by the subsequent need to obtain replacement insurance at a possibly higher price; and (d) it could be difficult for the Debtor to obtain financing agreements on favorable terms for future insurance policies.  Thus, the Debtor requests authorization to retain in place the existing Insurance Program and honor related obligations.  It is essential to the continued operation of the Debtor's business and reorganization that the Insurance Program be maintained on an ongoing and uninterrupted basis.

**IV.    E-Commerce Payments Motion**

39. Pursuant to the *Debtor's Emergency Motion for an Interim and Final Order Authorizing the Debtor to (I) Honor Customer Prepayments and Refunds of Electricity Services, (II) Receive, Process, and Honor E-Commerce Transactions, and (III) Pay Certain Fees Associated with E-Commerce Transactions* ("**E-Commerce Payments Motion**") the Debtor seeks an order authorizing it to (i) continue to honor the Prepetition Prepaid Series and Refund Transactions due to its customers; (ii) accept E-Commerce Transactions; and (iii) pay fees charged by E-Commerce Processors.

40. The Debtor, in the ordinary course of its business, provides retail electricity service to customers in Texas on a prepaid basis. Customers may prepay the Debtor for electricity service via a number of payment channels. Most payment channels incur processing fees payable by the Debtor to payment processing vendors ("**E-Commerce Processors,**" defined below). These payment processors facilitate about 90% of all payments from customers to the Debtor. As such, the Debtor incurs processing fees whenever its customers make debit or credit card payments via the Debtor's website, mobile app or Interactive Voice Response (IVR) system.

41. Once a payment is made, the customer is notified by email and/or text message confirming their payment has been successfully process. The customer is also provided a payment confirmation number. Customers can also review past payments via their "My Account" web-based or mobile application. Once customers have successfully made a payment, they can utilize electricity services up to the amount for which they have provided payment.

42. As a result of the Debtor accepting prepayment for services, there is a resulting liability to the customers for the services that have been paid for but not yet provided. To the extent that customers prepaid for services prior to the Petition Date that have not yet been utilized,

there are prepetition obligations owed by the Debtor to those customers ("**Prepeition Prepaid Services**").   As the Debtor's business structure is entirely reliant upon its ability to accept and process payment as well as provide electricity services to customers who have prepaid for them, it is critical to the Debtor's reorganization prospects and to the going-concern value of its business that it be able to honor the Prepetition Prepaid Services of its customers and process their credit and debit card payments for such services.

43.     Per Public Utility Commission of Texas (PUCT) regulations, any unused prepayments must be refunded to customers within 10 days.   Prepayments that have not yet be used for services, fees or other charges as governed by PUCT regulations are not Debtor's assets, and must therefore be refunded to customers if a customer stops receiving service from Debtor ("**Refund Transactions**").   The Debtor refunds any prepayments owed to customer either by direct credit to their debit or credit card that the customer used via an E-Commerce payment, or via paper check mailed to the customer at their physical address provided by the customer to the Debtor.

44.     The Debtor is a party to certain agreements with credit card companies and processors ("**E-Commerce Processors**") pursuant to which the Debtor is able to accept credit card and debit card payments, subject to certain adjustments, returns, promotional fees, and refunds ("**E-Commerce Transactions**").   Specifically, the Debtor has the ability to process credit and debit card transactions form the major credit card providers (Visa, MasterCard, Discover, and American Express) via its relationships with its E-Commerce Processors: Omega Transaction Corporation (Payment Processor) and Authorize.net (Payment Gateway).

45.     Receipts from E-Commerce Transactions, minus applicable fees (as discussed below), are deposited directly into the Debtor's bank account on a regular basis by the E-

Commerce Processors. Each day, all credit card charges from the previous day's business are electronically transmitted to the credit card processor. The E-Commerce Processors process the charges, and the gross funds are sent to the Debtor's bank account via an automatic clearing house payment generally within the next 2-3 business days. Once per month, any associated processor and credit card interchange fees are deducted from the Debtor's bank account via automatic clearing house payment.

46.     The Debtor is required to pay the E-Commerce Processors fees for their services, certain amounts of which may have accrued but remain unpaid as of the Petition Date. The processing fees charged by the E-Commerce Processors vary but are in the range of approximately $30,000 and $60,000 per month depending upon the volume of e-commerce transactions processed. As of the Petition Date, the E-Commerce Processor fees for July 2021 had not yet been paid, as such fees were scheduled to be automatically drawn from the Debtor's account on or about the third week of July, 2021.

47.     Pursuant to the Debtor's agreements with its E-Commerce Processors, when the Debtor processes a refund using a credit card, the Debtor is obligated to refund to the E-Commerce Processor the purchase price of the services canceled or otherwise returned plus certain adjustments (collectively, the "**Chargebacks**"). Generally, the Debtor's Chargeback obligations are satisfied by a reduction of payments currently owing to the Debtor under the processing agreements in the amount of the outstanding Chargebacks. It is possible that certain Chargebacks incurred by the Debtor immediately prior to the Petition Date may not have been fully netted out against credit card payments the Debtor received prior to the Petition Date.

48.     The Debtor receives over 90% of its customer payments via e-commerce Transactions. As such, any disruption in this payment channel would cripple the Debtor's ability

to collect payments from customers and operate its business. I would therefore submit that an order authorizing the Debtor to (i) continue to honor the Prepetition Prepaid Series and Refund Transactions due to its customers; (ii) accept E-Commerce Transactions; and (iii) pay fees charged by E-Commerce Processors to facilitate such transactions is necessary and in the best interests of the Debtor's estate, creditors, stakeholders and other parties in interest, and is necessary to avoid the irreparable harm that would occur should the Debtor's businesses lose the customers and associated revenue that would be lost in the absence of such relief.

[Remainder of the Page Intentionally Left Blank]

Pursuant to 28 U.S.C. § 1746, the undersigned makes the forgoing declaration as of the date of the filing under penalty of perjury.

Phillip Terry
President and CEO
Pogo Energy, LLC